IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SHARON S. COX,                        )
                                      )
                                      )
            Plaintiff,                )
                                      )
                                      )
      v.                              )
                                      )    No. 1:04cv476
                                      )
                                      )
DONALD H. RUMSFELD, SECRETARY,        )
DEPARTMENT OF DEFENSE,                )
                                      )
                                      )
            Defendant.                )

MEMORANDUM OPINION

     Before the Court is defendant's Motion For Summary Judgment

pursuant to Fed. R. Civ. P. 56 as to the pro se plaintiff's

three-count Complaint, which appears to allege three violations

of Title VII, 42 U.S.C. § 2000(e): (1) gender discrimination with

regard to training opportunities, (2) the creation of a hostile

work environment, also based on gender discrimination and (3)

retaliatory discharge.[1]  The Complaint seeks a declaration that

---

[1] All three of these claims are reflected in plaintiff's
administrative complaints and in the Complaint filed in this
Court, although the Complaint does not clearly delineate the
facts alleged to support each cause of action.  Accordingly, the
Court has considered plaintiff's gender discrimination charges,
even though she states in her Opposition to defendant's Motion To
Dismiss that "[t]his case is about reprisal and/or retaliation,
not discriminatory discharge and sex discrimination."  Pl.'s
Opp'n at 2.

defendant violated plaintiff's civil rights, an injunction prohibiting defendant from engaging in such conduct, compensatory damages, lost wages and benefits, reinstatement and promotion, attorneys' fees and costs. The pro se plaintiff has been given notice under Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), and has filed both a lengthy Opposition to defendant's Motion For Summary Judgment and a Correction To Response To Summary Judgment. Finding that the pleadings and the administrative record are sufficiently thorough and that oral argument would not further the decisional process, the Court will resolve defendant's Motion on the briefs submitted by the parties. For the reasons that follow, defendant's Motion For Summary Judgment will be granted.

## Factual Background[2]

This civil action concerns plaintiff's tenure as a GS-7 auditor for the Department of Defense ("DOD") in its Office of the Inspector General ("OIG"), a position that she began on October 28, 1998, after having worked for seven years as a full-time secretary for the DOD's internal audit office. Plaintiff

---

[2] Because plaintiff is the non-moving party, the following factual recitation is based on her representations. However, because the Complaint and plaintiff's Opposition provide a somewhat disjointed and incomplete version of the facts, the Court has gleaned some dates and details from defendant's Motion. Furthermore, because neither party has provided a clear factual roadmap, this Opinion highlights only those facts that are relevant to the Motion before the Court.

was terminated from the G-7 auditor position on October 15, 1999.[3]  In her Complaint, plaintiff alleges that almost from the beginning of her employment in the OIG, she was subjected to "a hostile work environment, sexual harassment, repeated threats, intimidation, unfair treatment because of her gender, and one instance of unwanted physical contact."  Compl. ¶ 21.  The Complaint further alleges that plaintiff's working conditions caused her sleeplessness, anxiety, headaches, diarrhea, joint pain and rashes and required her to take sick and annual leave almost continuously from June 7, 1999, until her termination in October of that year.  Plaintiff filed two EEO complaints during her tenure, one on February 25, 1999, for gender discrimination, including disparate treatment and the creation of a hostile work environment, and one on June 21, 1999, for retaliation.[4]  Plaintiff filed a third EEO complaint on October 18, 1999, after

---

[3] Plaintiff makes much of the fact that she had gained "career" status as a secretary and that the DOD allegedly erred in classifying her as "probationary" when she was hired as an auditor.  This probationary status enabled defendant to terminate plaintiff before her one-year anniversary in her new position.  However, because plaintiff's EEO Complaints did not allege that the DOD discriminated or retaliated against her in assigning her probationary status, any allegation of an erroneous classification is not relevant to the claims before the Court.

[4] These are the dates on which plaintiff filed her informal complaints with the EEO office, after which she informed defendant of her actions.  Following the EEO's review of her informal complaints, plaintiff filed formal complaints on April 12, 1999, and September 8, 1999, respectively.  Plaintiff also filed a Workers' Compensation claim on June 30, 1999.

her termination, alleging retaliatory discharge.

After the EEO issued a Final Agency Decision in defendant's favor, plaintiff appealed to the Equal Employment Opportunity Commission ("EEOC"), which conducted four days of hearings, at which plaintiff was represented by counsel, Richard Semsker, Esq. The EEOC ruled for defendant on August 26, 2003, and denied plaintiff's request for reconsideration on January 22, 2004.  On April 26, 2004, plaintiff filed a timely appeal of the EEOC's decision.

I.   Gender Discrimination

Plaintiff's first gender discrimination claim involves the timing of her training as compared to how male auditors' training was handled.[5]  The parties do not dispute that all new federal auditors must attend the Government Accounting Office's Government Audit Standards Introductory Audit Class.  The "Audit Handbook" issued by the Inspector General for the DOD states that a new auditor "usually" should enroll in this class within six months of being hired.[6]  See Office of the Assistant Inspector

---

[5] Plaintiff alternately describes the allegedly unfair delay in her training as based on gender discrimination and based on retaliation for her informal complaints of gender discrimination. The Court has analyzed the issue as a gender discrimination complaint because that is how plaintiff raised it before the EEOC.  Regardless of how this claim is characterized, however, the Court's analysis and conclusion as to its merits would be the same.

[6] The Office also has instituted a formal program of on-the-job training, which requires each employee to complete prescribed

General For Auditing, Handbook, Ch. 7-8, at 2 (3d ed. 1999).
Plaintiff began the course on May 10, 1999, which was six and a
half months after her October 28, 1999, start date and a few days
after her Midyear Review.  She complains that by scheduling two
male co-workers to attend the class before their six-month
reviews, substituting a male co-worker instead of her into an
opening that arose in an April class, and refusing to substitute
her for a male auditor hired after her who was enrolled in an
earlier class, defendant discriminated against her on the basis
of her gender.[7]  Plaintiff maintains that any deficiency in her
performance was due to the delay in receiving required training
and to her being forced to take on audits and write work papers
too soon.

In her second discrimination claim, plaintiff alleges that
she was subjected to a hostile work environment because of her
gender.  Although plaintiff faults numerous supervisors for

---

readings, self-assessments and other exercises and for which the
employee has significant responsibility.

[7] In responding to defendant's Motion, plaintiff also asserts
in passing that she was retaliated against by being denied an
opportunity to attend a higher level of training.  This
allegation does not appear in her Complaint, however, nor does it
seem pertinent, given that plaintiff was terminated before her
one-year anniversary and that the employee to whom she compares
herself attended the advanced training in his nineteenth month as
an auditor.  Plaintiff did raise this issue in her April 12,
1999, EEO complaint but stated therein, apparently erroneously,
that the male employee had received advanced training before his
twelfth month as an auditor.

failing to intervene, her claim essentially rests on the alleged
behavior of her direct supervisor, Neal Gause.[8]  The first event
of which plaintiff complains allegedly occurred on November 2,
1998, while she, Gause and Gause's supervisor, Jack Snider,[9] were
driving to a site visit.  During the trip, the men asked
plaintiff whether she was married or dating, questions to which
she objected.  Plaintiff acknowledges that her supervisors
stopped the questioning at her request.  However, she alleges
that on November 20, 1998, during a drive to another audit trip,
Gause loudly and crudely described his pre-marital and marital
sexual exploits, despite her pleas to him to stop and to Snider
to order Gause to do so.  Plaintiff also claims that beginning in
December 1998, Gause repeatedly began to direct "rages" at her.
She described these episodes as "loud, highly animated red-faced
bouts of bullying, yelling, and insulting remarks, often in
public places."  Compl. ¶ 21.  Plaintiff maintains that Gause

---

[8] Gause was removed as plaintiff's supervisor after she sent
an e-mail to Gause's boss on February 22, 1999, demanding no
further contact with Gause.  According to Gause's EEOC testimony,
he advocated the change also because the supervisory relationship
clearly was not working for either party.

[9] For the most part, plaintiff does not complain about
Snider's behavior, except to the extent that he failed to
intervene when Gause allegedly harassed her.  The Complaint does
allege that Snider required plaintiff to have lunch with him
every day at the Pentagon until she got out of it by making plans
to go walking with a friend.  However, plaintiff's own testimony
at the EEOC hearings refutes this characterization, as she
testified that she enjoyed having lunch with him.

never directed these "rages" at male employees and that she felt that Gause "yelled like [that] because [she was] female." Id.; Tr. Vol. I at 101-2. This behavior humiliated her and made her fear for her physical safety. Compl. ¶ 21. In addition to her complaints of such treatment in the office, plaintiff alleges that during a December 1998 trip to on-site audits in Oklahoma and Alabama, Gause both "raged" at her numerous times and extended what she felt was an improper invitation to drive together to Atlanta, Georgia, on a Saturday. Plaintiff further alleges that on the same trip, Gause attempted to sabotage her audit notes, taking them and then accusing her of losing them before returning them to the shared audit bag.[10] Finally, plaintiff relates a January 29, 1999, meeting in which she says that Gause threatened to beat her like a dog.[11]

---

[10] Plaintiff also alleges that on more than one occasion, someone sabotaged or deleted her computer files and that she thinks that it was Gause. As a result of her fears of sabotage, one day plaintiff turned her monitor away from Gause and tipped it over. Gause threatened to write her up for destruction of government property but did not do so.

[11] This meeting occurred after plaintiff accused Gause of threatening to fire her when he outlined the deficiencies in her performance and warned that she risked being terminated if her work did not improve. Plaintiff was so upset by this warning that Gause took her to meet with Snider. According to the EEOC record, in response to plaintiff's request during the meeting with Snider to be given positive feedback and her comment that even dogs like to be petted, Gause told a story about dog training as an example of the value of negative reinforcement. It was this story that plaintiff interpreted as a threat to beat her like a dog, an interpretation with which both Snider and Gause disagreed in their EEOC testimony.

Plaintiff also alleges that Gause held her to unreasonable performance expectations and managed her work inappropriately. For example, she maintains that he assigned her impossible projects, such as analyzing a 25-page draft audit in 15 minutes, and then yelled that she possessed only "secretarial skills" when she reported her findings.  Plaintiff also complains that Gause made her report to him every ten minutes yet provided her no feedback, written or otherwise, to assist in her development. She lodges the same complaints regarding lack of feedback against Snider and John Dzik, to whom she reported after she requested a transfer from Gause's supervision.[12]  Finally, plaintiff points to incidents on March 8, 1999, after she no longer worked for Gause, when he allegedly threatened to fire her,[13] and on April 1, 1999, when he allegedly "rammed his body into" her in the hallway.  Compl. ¶ 31.

## II.  Retaliation

Plaintiff claims that after seeking assistance with her situation from Snider and his supervisor, John Meling, they

---

[12] All three men's EEOC testimony and numerous e-mails from Snider regarding plaintiff's assignments refute this contention. Tr. Vol. at 309; Tr. Vol. IV at 40.  Specifically, Dzik testified that he prepared written comments on the papers Cox submitted to him before she went to training but that he never had an opportunity to review those comments with her because she continually rescheduled the meetings he arranged, telling him she was too busy with other things.  Tr. Vol. III at 53-55.

[13] Gause denies this and testified that he has no authority to fire anyone.  Tr. Vol. III at 334.

retaliated against her for both her informal and formal complaints.  Specifically, she alleges that after she complained about how Gause treated her on the field audits in Oklahoma and Alabama, Snider and Meling retaliated against her by denying her the use of credit hours.[14]  She also alleges that after she sent an e-mail on February 22, 1999, in which she stated that there was "no choice" but for her to have no contact with Gause, and filed the first of her EEO complaints on February 25, 1999, Snider too began giving her numerous work assignments with unreasonable deadlines.  Plaintiff complains that although Snider responded to her complaints about Gause by transferring her to John Dzik's team[15] and assigning her a mentor, Brian Flynn,[16] Snider did not remove her from Gause's work unit, which enabled

---

[14] Credit hours enable qualified employees to obtain extra leave as compensation for required after-hours work.

[15] Plaintiff appears to have reported directly to Snider from February 22, 1999, when she demanded reassignment, until March 22, 1999, when Dzik became available to supervise her. Before even beginning to work for Dzik, plaintiff complained that he was "gender-biased" and refused to work for him as well, but Pat Brannin, Deputy Director of Acquisition Management Directorate, who was two levels above Snider, researched the allegation and found it to be baseless.  Accordingly, plaintiff did report to Dzik for the last month and a half that she reported to work.

[16] Flynn testified before the EEOC that he broke with protocol and addressed some of plaintiff's allegations with Brannin, rather than with plaintiff's supervisors, because her allegations regarding Gause, including the dog training story, concerned him.  He also testified, however, that he was satisfied with the explanations he received, which enabled him to put plaintiff's statements in context.

9

Gause to continue to harass her.

Plaintiff also characterizes her negative Midyear Review on May 6, 1999, as retaliatory and containing "numerous factual errors and unsubstantiated criticisms," which her supervisors refused to change after she submitted a rebuttal.  Compl. ¶ 35.  She further claims that the Review was improperly based primarily on the input of Gause, against whom she had already filed an EEO complaint.  Although the Midyear Review, which followed that EEO complaint by less than two months, scored plaintiff as needing improvement in every category, save for one that was not applicable to plaintiff, it also recognized that plaintiff had not yet completed her training and suggested that she be given three months to demonstrate improvement after completing the introductory audit class.  Plaintiff never took advantage of this three-month improvement period, however, because after she attended the required training course for three weeks in May, she immediately took a combination of sick and annual leave from June 7, 1999, until she was terminated on October 15, 1999.[17]

_____

[17] During that period, plaintiff worked only one day, June 21, 1999.  On that day, as detailed below, she informed her supervisors that she would not be completing substantive work but would instead be concentrating on administrative tasks related to opposing her Midyear Review and to the filing of her second EEO complaint.

According to the Complaint, Gause's actions and failure by plaintiff's supervisors to alleviate the situation precipitated the recurrence of plaintiff's long-dormant lupus symptoms.  Plaintiff claims, and the EEOC record reflects, that the clinical psychologist who had been treating her since 1991 "link[ed] his

Although plaintiff complains that her supervisors made no attempt
to get her back to work, correspondence between Snider and
plaintiff during that time reveals that Snider warned plaintiff
directly that she needed to be at work to demonstrate improvement
or she risked termination.  He also repeatedly requested in
writing further information from plaintiff regarding her absence,
which plaintiff did not provide until Snider threatened to
terminate her for being away without leave.  Three months after
plaintiff's Midyear Review, on August 4, 1999, Snider filed a
Proposal For Termination From Federal Service ("Proposal").  The
Proposal cited both plaintiff's sub-standard performance and her
lack of qualifications when hired for the position.[18]  Following
Meling's review and acceptance of this Proposal, plaintiff was
terminated on October 15, 1999, after which she filed the EEO

---

diagnosis of [her] traumatic reaction to 'that office['s]' . . .
hostile work environment, and requested that she be moved to
another office."  Compl. ¶ 33.  Plaintiff alleges that her
supervisors never responded to faxes from the doctor to this
effect.  However, those faxes were sent to justify plaintiff's
sick leave during her absence, so it is not entirely clear what
response she sought, other than the approval of her leave.


[18] The Court need not address plaintiff's extensive arguments
regarding her qualifications and whether she was improperly
dismissed on this ground because as detailed below, Meling
concluded in his review of the Proposal that plaintiff's
termination was warranted based on her performance assessment
alone.

complaint for retaliatory discharge on October 18, 1999.[19]

**Discussion**

I.   Summary Judgment

Summary judgment is proper under Fed. R. Civ. P. 56 when the pleadings and supporting statements or affidavits show that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law.[20]   This standard is satisfied when the non-moving party has failed to provide sufficient evidence in support of an essential element of her case on which she has the burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be drawn in favor of the non-moving party, Thompson Everett, Inc. v. Nat'l Cable Advertising, L.P., 57 F.3d 1317, 1323 (4th Cir.

---

[19] Plaintiff mentions in a footnote in her Opposition that defendant replaced her before actually discharging her.  However, she did not raise this issue in her Complaint, nor does she substantiate it in her Opposition.

[20] Plaintiff appears to complain that granting defendant's Motion would improperly deprive her of her day in court.  The Supreme Court, however, has explained that summary judgment is "properly regarded not as a procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex, 477 U.S. at 327 (quoting Schwarger, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984)).
Plaintiff also complains that she is unable to respond properly to the Motion For Summary Judgment because she has not received certain records and defendant has not agreed to stipulations regarding former DOD employees.  As defendant stated in its discovery responses and to the Court, the DOD does not retain the records plaintiff seeks for former employees.

1995), and evidence is sufficient if, based on that evidence,
"the jury could reasonably find for the plaintiff." Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  However, the
non-moving party cannot defeat a motion for summary judgment
simply by relying on her own allegations, Fed. R. Civ. P. 56;
Celotex, 477 U.S. at 324, but rather must respond with
"significant probative evidence." Anderson, 477 U.S. at 249.
Under this standard, "merely colorable" evidence will not suffice
to overcome a summary judgment motion. Id. at 249-50; Thompson
Everett, 57 F.3d at 1323.

II.  McDonnell Douglas Burden-Shifting Framework

     A plaintiff may establish her discrimination claim through
either direct or circumstantial evidence. See, e.g., Evans v.
Techs. Applications & Servs. Co., 80 F.3d 954, 959 (4th Cir.
1996).  When, as here, a plaintiff lacks direct evidence that an
employer intentionally discriminated against her, courts employ
the burden-shifting method of proof established in McDonnell
Douglas Corp. v. Green. 411 U.S. 792, 802-05 (1973); see also
Causey v. Balog, 162 F.3d 795, 800 (4th Cir. 1998).  Under the
McDonnell Douglas framework, a plaintiff must first establish a
prima facie case of discrimination.  411 U.S. at 802.  The burden
then shifts to the defendant to provide a legitimate, non-
discriminatory reason for its employment action. Id.  Finally,
if the employer is able to provide such an explanation, the

plaintiff bears the burden of showing that the given reason is a pretext for what was actually a discriminatory action. Id. at 804-05.

III. Gender Discrimination

    A.   Training Opportunities

    To establish a prima facie case of disparate treatment based on gender discrimination, a plaintiff must produce evidence demonstrating all four of the following elements: (1) that she is a member of a protected class, (2) that her job performance was satisfactory, (3) that she was subjected to an adverse employment action by her employer and (4) that similarly situated employees outside of her protected class received more favorable treatment. E.g., EEOC v. Sears Roebuck & Co., 243 F.3d 846, 851 n.2 (4th Cir. 2001). As a female, plaintiff undisputably belongs to a protected class. Plaintiff's satisfactory job performance will be assumed for purposes of this analysis. However, the Court finds that plaintiff has failed to establish the third element of her disparate treatment claim and therefore cannot establish a prima facie case of discrimination.[21]

    An adverse employment action for purposes of Title VII is one that adversely affects the "terms, conditions, or benefits of employment." Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir.

_____

[21] Because plaintiff has not established the third element, the Court need not assess the treatment of similarly situated employees.

2001).  Conduct short of an "ultimate employment decision," such
as a firing or demotion, can meet this standard.  Id.  However,
not every action or decision that affects some aspect of an
individual's employment affects the "terms, conditions, or
benefits" of that employee's position.  Id. at 866.  Rather, the
determination of whether an employer's action or decision
constitutes an adverse employment action under Title VII turns on
the facts of the case and the nature and extent of the
detrimental impact on the employee.  See id. at 867.  For
example, reassignment to a new position might qualify as an
adverse action in some cases but not in others, depending on
whether the employee's compensation, level of responsibility or
opportunity for promotion was decreased.  See, e.g., Peary v.
Goss, No. 1:04cv966, 2005 WL 884979, at *7 (E.D. Va. April 15,
2005).

In this case, the two-week delay in plaintiff's attendance
at basic training beyond the recommended, but not required, time
period can in no way be construed to have affected the "terms,
conditions, or benefits" of her position.  Plaintiff was not
denied an opportunity to attend basic training that was granted
to other employees, an allegation that might support a claim that
she was rendered less able to compete for promotions by the
denial.  In addition, plaintiff's supervisors accounted for the
delay in her training in the Midyear Review at issue in her

15

Complaint, affording plaintiff the benefit of the doubt that her
performance could improve upon completion of the class.

Furthermore, even assuming that plaintiff's allegations with
regard to the delay in her training qualified as an adverse
action, and that plaintiff could otherwise establish a prima
facie case of discrimination, she cannot meet her burden under
the McDonnell Douglas framework because she has presented no
evidence that defendant's reasonable, non-discriminatory
explanation for the timing of her training is pretextual.  Snider
testified in the EEOC hearings that when the list of available
class dates was circulated in November, he signed plaintiff up
for the next available date, which was in early May, six and a
half months after plaintiff's late October start date.  Tr. Vol.
IV at 119-120.  Snider acknowledged that when a cancellation
subsequently resulted in an opening in an April class, he
enrolled a male employee hired after plaintiff.  Id.  However,
Snider explained that he did so because plaintiff was already
enrolled to attend a class in the near future and because by
substituting an employee who was not yet enrolled, the department
would not forfeit the fee for the April slot or for plaintiff's,
as would have been the case had he transferred plaintiff's
enrollment.  Snider also noted that plaintiff had numerous
ongoing projects to complete in April and that her May class was
only one month later.  Id. at 168-69, 293-94.  With regard to the

16

employee hired after plaintiff for whom she requested that she be substituted in an earlier class, defendant explained in its answers to interrogatories that Snider did not have supervisory authority over that employee and therefore could not control the employee's training schedule.  Def.'s Responses To Pl.'s First Request For Discovery ¶ 4.

Especially considering the tightness and inflexibility of government agencies' budgets, the Court finds this non-discriminatory explanation entirely legitimate.  Moreover, plaintiff does not offer any evidence to refute Snider's explanation.  Instead, she simply repeats her own conclusory allegations that defendant discriminated against her by not providing her with an earlier training opportunity.[22]  Such conclusory statements do not constitute evidence upon which a reasonable trier of fact could infer that defendant's proffered explanation is pretextual.  Accordingly, the Court finds that defendant is entitled to summary judgment with regard to

---

[22] To corroborate her allegations, plaintiff attaches her personal diary to her Opposition.  That diary repeats the allegations in the Complaint and does not constitute independent evidence of the allegations therein.

Similarly, in plaintiff's Correction To Response To Summary Judgment, she lists as "documentation" her own allegations and assertions in various forms, including those contained in her rebuttals to the Midyear Review and the Proposal To Terminate, her diary and her EEOC testimony.  As discussed above, none of these sources comprises independent evidence sufficient to rebut defendant's non-discriminatory reasons for his decisions concerning plaintiff's training.

plaintiff's claim that defendant failed to provide her with training opportunities equal to those afforded male employees.[23]

B.   Hostile Work Environment

To substantiate a gender discrimination claim based on a hostile work environment, a plaintiff must demonstrate that (1) she was subjected to unwelcome harassment, (2) the harassment was based on her gender, (3) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive atmosphere and (4) there is some basis for imposing liability on the employer.[24]   Causey, 162 F.3d at 801.   Under this standard, the Court finds that although Gause's behavior, as described by plaintiff, may have been boorish and at times inappropriate, the alleged actions are not sufficient to make out a prima facie case of gender-based hostile work environment.

The first deficiency in plaintiff's claim is that only two of her allegations--the questions she claims Gause and Sinder asked about her marital status and Gause's alleged discussion of

---

[23] Plaintiff alleges one additional instance of disparate treatment--that her supervisors revoked her privilege to use credit hours while allowing similarly situated males to enjoy this benefit.   This clearly does not qualify as an adverse employment action.   Furthermore, even if it did, plaintiff does not provide any evidence to demonstrate that her supervisors' determination that she was not using her credit hours appropriately was pretext for discrimination.

[24] Because the Court finds that plaintiff has not met her burden of demonstrating a gender-based hostile work environment, the Court need not address this fourth factor regarding liability for such discrimination.

his sexual exploits--even arguably tie Gause's behavior to her gender.  There is no evidence other than plaintiff's conclusory allegations that the other conduct she found offensive--Gause's "rages," his discussion of negative reinforcement and dog training and his demanding supervision of her work--was motivated by or related to her gender.  See Hartsall v. Duplex Products, Inc., 123 F.3d 766, 772 (4th Cir. 1997)("[Plaintiff] simply cannot show that 'but for' her gender, she would not have been described as one of the 'little people' or as a 'slave.'").  To the contrary, Dzik, who shared an office with Gause, and Flynn, who had known Gause since 1995, testified that they had never witnessed him treating male and female auditors differently.  Tr. Vol. I at 210-11; Tr. Vol. III at 176-77.  Instead, their testimony supports Gause's own description of himself as interacting with all of his team members, both make and female, as a generally loud, red-faced person, even when not angry.[25] Tr. Vol. III at 270; Tr. Vol. IV at 70-71, 86, 97.  As such, plaintiff's personal belief that Gause yelled at her because she was female cannot, without more, substantiate her claim.

Moreover, even if Gause's loud mannerisms and strict supervision were targeted at plaintiff as a female, the conduct she describes is not sufficiently severe or pervasive to

---

[25] Gause also explained that he has a medical condition that makes his face ruddy, for which he takes antibiotics.  Tr. Vol. III. at 270.

constitute a hostile work environment.  To determine whether the alleged conduct is sufficiently severe or pervasive, a court must look at the totality of the circumstances, including the frequency and severity of the discriminatory conduct, "whether the conduct is physically threatening or humiliating or a mere offensive utterance and whether the conduct unreasonably interferes with [the] employee's work performance."  Smith v. First Union Nat'l Bank, 202 F.3d 234, 242 (4th Cir. 2000); see also Anderson v. G.D.C., Inc., 281 F.3d 452, 459 (4th Cir. 2002) ("[Title VII] is not designed to purge the workplace of vulgarity.")(citations omitted).  Furthermore, the test is both subjective and objective.  Not only must the plaintiff perceive her environment to be hostile, but "conduct that . . . a reasonable person would [not] find hostile or abusive is beyond Title VII's purview."[26]  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993).  The Fourth Circuit also has recognized that personality conflicts and unfair treatment "arise routinely in employment relationships" and do not alone constitute a discriminatory hostile work environment.  See Hawkins v. Pepsico, Inc., 203 F.3d 274, 282 (4th Cir. 2000).  Finally, as with gender

---

[26] In her Opposition, plaintiff conflates these two standards and erroneously states that a hostile work environment exists if the plaintiff believes that a reasonable person would find the environment to be hostile.  Instead, the subjective and objective components of the test both must be met and are independent of each other.

discrimination, conclusory, unspecific allegations of a hostile work environment will not survive a defendant's summary judgment motion.  See Causey, 162 F.3d at 801-02.

The Supreme Court, the Fourth Circuit and this Court have recognized hostile work environment claims when plaintiffs have presented evidence of daily and highly offensive treatment.  See, e.g., Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 333 (4th Cir. 2003) (plaintiff was subjected to daily discussions of male co-workers' sexual exploits in extremely graphic terms); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 186 (4th Cir. 2001)(employer constantly referred to African Americans as "monkeys" and "niggers," a term that the court deemed "[f]ar more than a 'mere offensive utterance,' . . . [and] pure anathema to African-Americans").  The courts have emphasized, however, that "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace" and have granted summary judgment in favor of defendants even when the alleged conduct clearly was inappropriate in some regard.  See, e.g., Hartsall, 123 F.3d 766, 771, 773 (4th Cir. 1997)(defendant's statement that "[w]e've made every female in this office cry like a baby" and isolated references to plaintiff as a slave and comments about buxom magazine pictures were "mildly offensive (and unactionable) utterances"); Taylor v. Va. Dept. of Corrections, 177 F. Supp. 2d 497, 502-03 (E.D. Va.

2001)(supervisor's "base" behavior during the course of a year,
including a handful of derogatory remarks about African Americans
and comments that "[b]lacks have too many special rights" and
could not be fired, was not sufficiently frequent or severe to
create a hostile work environment).

As in <u>Hartsall</u>, plaintiff's allegations, even if taken as
true,[27] are "far from the paradigmatic case of sexual
harassment." <u>See</u> 123 F.3d at 773. Plaintiff does not allege
that she was subjected to "rages" every day, nor does she report
the repeated use of vulgar, graphic sexual terms or inherently
demeaning language, or even that Gause's behavior was so
degrading that she was unable to perform her job. To the
contrary, plaintiff contends that she was performing above par
and deserved a strong Midyear Review. Accordingly, plaintiff has
failed to carry her burden of establishing a <u>prima facie</u> case of
a hostile work environment, and defendant is entitled to summary
judgment on this claim as well.

IV. <u>Retaliation</u>

To establish a claim of retaliation, a plaintiff must show
(1) that she engaged in protected activity, such as filing an EEO

---

[27] Gause and Snider, the latter of whom Meling described in
his testimony as "straight-laced," deny that Gause told Cox
sexual stories. Tr. Vol. IV at 122, 264. Dzik also testified
that he had never heard Gause tell sexual jokes or stories,
either in the office or during work-related travel, and that he
had witnessed the alleged "rages" plaintiff describes and that
she did not seem intimidated. Tr. Vol. III at 45-46, 71-75.

complaint, (2) that the employer took an adverse action against
her and (3) a causal connection between the protected activity
and the adverse action.  Causey 162 F.3d at 803.  As above, in
the absence of direct evidence of retaliation, which plaintiff
has not presented in this case, a court must employ the McDonnell
Douglas burden-shifting framework.  In this regard, close
proximity between the protected activity and the adverse action,
"gives rise to a sufficient inference of causation to satisfy the
prima facie requirement."  King v. Rumsfeld, 328 F.3d 145, 151
(4th Cir. 2003).  However, in considering whether a plaintiff has
successfully rebutted her employer's non-discriminatory
explanation for her termination, the Fourth Circuit has noted:
"Plainly, mere knowledge on the part of an employer that an
employee it is about to fire has filed a discrimination charge is
not sufficient evidence of retaliation to counter substantial
evidence of legitimate reasons for discharging that employee."
See Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir.
1989).

 A.   Midyear Review

 Plaintiff is able to establish a prima facie case of
retaliation in that her poor Midyear Review on May 6, 1999,
closely followed her February 25, 1999, EEO complaint.  However,
as in Williams, plaintiff has not produced sufficient evidence to
demonstrate that defendant's non-discriminatory explanation for

her negative performance assessment is pretextual.  Therefore, she cannot establish a causal connection between the protected activity and the adverse action.  See 871 F.2d at 459.

Plaintiff's own evidence supports the conclusion that defendant was concerned about her performance deficiencies and had communicated those concerns to her well in advance of her first informal EEO complaint on February 22, 1999.  In that complaint, which plaintiff attaches to her Opposition, she asserted that: (1) on December 17, 1998, Gause said that she had not completed her work papers; (2) on January 5, 1999, Snider and Meling revoked her privilege to accrue credit hours because she was not completing her work papers; (3) in January 1999, Gause began to supervise her work closely; (4) on January 29, 1999, Gause told her that she possessed only secretarial skills, that she was not meeting the requirements of her job, that her work papers were useless and that if she did not improve her performance, she was at risk of termination; (5) on February 2, 1999, Gause told her that her work papers were not fit to be reviewed and that her reasoning was illogical; and (6) on February 11, 1999, Gause began to require her to report to him every ten minutes.  In addition, in a memo to Snider dated February 25, 1999, plaintiff appeared to acknowledge the poor quality of her work, which she attributed to a lack of training, and she asked for an extension of a work paper deadline.

24

Plaintiff's representations to the EEO are consistent with defendant's comments about her performance in the Midyear Review and the testimony of her supervisors, both of which detail her failure to complete her assignments to standard and on time.[28] The Midyear Review and the testimony also both reflect that plaintiff failed to improve, even with significant supervision, and reiterate that plaintiff's supervisors made her aware of her deficiencies well in advance of plaintiff filing her first EEO complaint.

Not only do plaintiff's representations to the EEO support defendant's position that there was no connection between plaintiff's first EEO complaint and her Midyear Review, but plaintiff offers nothing beyond her own assertions to demonstrate that the Midyear Review was retaliatory, rather than an accurate

---

[28] The Midyear Review reported that plaintiff did not follow her supervisors' guidance or the credit hour policies, often lost documents, could not complete her work on time, frequently requested extensions, was not organized or prepared on site, resisted researching data and submitted work papers with sentence fragments, unexplained acronyms, incorrect audit steps, unclear logic and inaccuracies.  John Dzik testified to similar deficiencies in the work papers plaintiff completed for him before she went to training, which were not included in the Midyear Review.  Tr. Vol. III at 46-49.

Snider and Meling's visit to Kimberly Brackett, Supervisory Personnel Management Specialist, in early February 1999 provides further support for defendant's argument that plaintiff's supervisors expressed dissatisfaction with her performance before her EEO complaint.

25

reflection of her performance deficiencies.[29]  Although plaintiff
submitted a detailed rebuttal to the Midyear Review, both orally
and in writing, she did not provide evidence that refuted the
comments in the Review.  Instead, she pronounced the comments
"false" and designed by Gause to harm her and to retaliate for
her previous EEO complaint.  Although plaintiff argued that Gause
had miscalculated the number of days that it took her to complete
her work papers, and although Gause acknowledged some degree of
error in those calculations during the EEOC hearings, Gause also
explained that plaintiff had confused two different calculations
and that the error was not material to his overall assessment of
her performance.  The excerpt from the hearing submitted by
plaintiff truncated that explanation.  Tr. Vol. IV at 37-39.

As with her disparate treatment and hostile work environment
claims, plaintiff has offered only her own conclusory assertions,
without documentation or corroboration, in support of her claim
that the Midyear Review was false and retaliatory.  Moreover,

_____

[29] Possibly recognizing that her own allegations are not
sufficient to withstand defendant's Motion, plaintiff has
attached to her Opposition the affidavit of Mr. Henry Schornagel,
a retired G-14 auditor with the General Accounting Office and the
Department of Justice, who also testified before the EEOC.
Schornagel states in his affidavit that he has reviewed
plaintiff's work papers and found them acceptable, given her
level of training.  The Court does not credit this evidence,
however.  Most important, as the administrative law judge also
observed, this witness possesses no knowledge of whether
plaintiff's work papers were substantively accurate and complete,
seemingly the most critical aspects of plaintiff's performance.

even platinfiff's own evidence supports the conclusion that her supervisors were dissatisfied with her performance long before she filed her first EEO complaint.  Accordingly, plaintiff has failed to rebut defendant's reasonable, non-retaliatory explanation for the negative Midyear Review and establish the third prong of her retaliation claim.

B.   Termination

For the same reasons stated above, the Court finds that plaintiff has failed to produce sufficient evidence that defendant's non-discriminatory explanation for her termination is pretextual and that the adverse action instead was retaliatory. The parties do not dispute that the Proposal to Terminate was issued three months after the negative Midyear Review, in which plaintiff had been warned that she could be terminated if she did not improve her performance within three months.  During that warning period, plaintiff received the benefit of the introductory training class, but thereafter she did not return to work, save for one day.  Plaintiff's absence rendered her unable to demonstrate the requisite improvement, prompting Snider to submit and Meling to approve the Proposal.

Again, plaintiff's own, unsupported assertions do not establish that defendant terminated her in retaliation for her previous complaints.  Plaintiff relies primarily on the document she submitted in response to the Proposal To Terminate, in which

she advanced an odd combination of arguments--including accusing her supervisors of misrepresenting the quality of her work while simultaneously acknowledging that she had made errors and stating a desire to correct them.  Plaintiff also pointed out that Snider had written positive comments on at least one of her work papers and had not written negative comments on others.  However, as Meling explained in his review of the Proposal to Terminate, plaintiff appeared to misunderstand the process through which work papers are edited.  She would not have gotten personal credit for the positive comments on a final paper, which would have included her supervisors' corrections.[30]   In addition, plaintiff acknowledged in her response that the four work papers she submitted to Dzik in the days between the Midyear Review and training were missing information, employed inaccurate audit steps and/or referenced attachments that were not included.  Although she requested an opportunity to correct those work papers, because she did not return to work after completing training, she never did so.

Lastly, plaintiff's extended absence clearly justifies defendant's decision to terminate her.  As noted above, after

---

[30] Plaintiff also accused Snider of falsifying the dates on her drafts to make it appear as if she had submitted them as final copies.  Plaintiff provides no evidence other than her allegations to support this claim and again appears to misunderstand the process by which her work was reviewed and edited into final form.

completing training, plaintiff only came to work on one day, during which she appears primarily to have made a list, which she submitted to Snider and Meling, of tasks she needed to complete related to contesting her Midyear Review, filing a second EEO complaint, submitting sick leave documentation and checking her computer for signs of sabotage.   In response to this list, and apparently in an attempt to warn plaintiff of the risk of continued absence, Snider sent her a letter counseling that if at all possible, she needed to be at work to demonstrate that she could perform to standard or else she could face termination.[31] Plaintiff's argument that defendant should have transferred her or taken other less drastic action, such as granting her leave without pay, is unavailing.   The regulation she quotes for this proposition clearly states that removal is a proper remedy when a federal employee is not performing up to standard, and plaintiff does not contest the testimony of Kimberly Brackett, the supervisory personnel management specialist, that plaintiff never requested leave without pay, as would be required to receive that accommodation.   See Pl.'s Opp'n at 16 n.12; Tr. Vol. II at 269.

Other than her own allegations, plaintiff has again failed to present any evidence to refute defendant's legitimate, non-retaliatory explanation for terminating her.   Accordingly,

---

[31] The letter also addressed the insufficiency of plaintiff's medical documentation for her leave.

defendant is entitled to summary judgment on plaintiff's retaliatory discharge claim.

## Conclusion

For the reasons set forth above, defendant's Motion For Summary Judgment will be granted, and judgment will be entered in favor of defendant.  An appropriate order will issue.

The Clerk is directed to forward copies of this Memorandum Opinion and the accompanying Order to counsel of record and the pro se plaintiff, Sharon S. Cox.

Entered this 10th day of May, 2005.


                                    _____/s/_____
                                    Leonie M. Brinkema
                                    United States District Judge


Alexandria, Virginia

30